JILL M. PIETRINI (*Admission Pro Hac Vice Pending*)
*jpietrini@manatt.com*
MANATT, PHELPS & PHILLIPS, LLP
11355 West Olympic Boulevard
Los Angeles, CA  90064-1614
Telephone:  (310) 312-4000
Facsimile:  (310) 312-4224

ROBERT D. BECKER (*Admission Pro Hac Vice Pending*)
*rbecker@manatt.com*
SHAWN G. HANSEN (USB No. 8603)
*shansen@manatt.com*
MANATT, PHELPS & PHILLIPS, LLP
1001 Page Mill Road, Building 2
Palo Alto, CA 94304
Telephone: (650) 812-1300
Facsimile: (650) 213-0260

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH
## CENTRAL DIVISION

| | |
|---|---|
| LL&L INNOVATIONS, LLC, and LOWDOWN DISTRIBUTION, INC., <br><br> Plaintiffs, <br><br> v. <br><br> JERRY LEIGH OF CALIFORNIA, INC.; KOHL'S DEPARTMENT STORES, INC.; JC PENNEY CORPORATION, INC.; RUSTY LICENSING, INC.; HOT TOPIC MERCHANDISING, INC.; and SUN COAST MERCHANDISE CORPORATION d/b/a SUN COAST, <br><br> Defendants. | Civil Action No.: 2:10-cv-829-TC <br><br> U.S. District Judge Tena Campbell <br><br> **DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** <br><br> **JURY DEMANDED** |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION AND STATEMENT OF ISSUES ..................................... 1

II.    STATEMENT OF FACTS ........................................................................ 4

    A.     The Parties ................................................................................ 4

        1.     Defendants ...................................................................... 4

        2.     Plaintiff LL&L ................................................................. 5

        3.     Plaintiff Lowdown and Mr. Zhou's Other Related Entities..................... 6

    B.     Procedural Background................................................................ 7

    C.     The Patent-in-Suit ..................................................................... 8

    D.     The HB3 Technology™ and Hoodie Buddie™ Products.................................. 10

    E.     The Prior Art ........................................................................... 13

III.   THE MOTION FOR TEMPORARY RESTRAINING ORDER AND
      PRELIMINARY INJUNCTION SHOULD BE DENIED IN ITS ENTIRETY ............. 17

    A.     Applicable Legal Standards ...................................................... 17

    B.     Plaintiffs Failed to Show a Likelihood of Success on the Merits ....................... 18

        1.     Claim Construction ...................................................... 18

            a.     The Claim Limitation "Acts as a Drawstring for the Hood"
                Should be Construed to Mean: "The Wire Must be Used to
                Tighten or Close the Hood Opening .......................................... 19

            b.     The Literal Scope of the Earphone Wire Drawstring
                Limitation is Limited by Statements Made During
                Prosecution of the '192 Patent ....................................... 19

            c.     Prosecution History Estoppel Precludes Application of the
                 Doctrine of Equivalents ............................................... 21

        2.     The HB3 Technology™ Products Do Not Infringe as a Matter of
           Law Because They Do Not Include A Wire That "Acts as a
           Drawstring for the Hood" ........................................... 22

            a.     There is No Direct Infringement as a Matter of Law.................. 22

            b.     Plaintiffs Have Not Alleged Facts Sufficient To State a
                 Claim for Infringement by Inducement ..................................... 23

            c.     Plaintiffs Have Not Alleged Facts Sufficient To State a
                 Claim for Contributory Infringement........................................... 24

        3.     Claim 1 of the '192 Patent is Invalid as Being Anticipated and/or
           Obvious Because Numerous Prior Art References Expressly or
           Inherently Disclose and/or Strongly Suggest the Earphone Wire
           Drawstring Limitation............................................... 25

# TABLE OF CONTENTS
(continued)

Page

      a.    Claim 1 of the '192 Patent is Anticipated Under  35 U.S.C.
§ 102 ........................................................................................... 26

      b.    Claim 1 of the '192 Patent is Obvious Under Section 103 .......... 29

C.    Plaintiffs Failed To Show That They Would Be Irreparably Harmed
Absent a Preliminary Injunction ......................................................... 30

    1.    Plaintiffs Identified No Specific Potential Harms to Substantiate
Their Unsupported Factual Conclusions Regarding Lost Market
Share and Price Erosion ......................................................... 31

    2.    Plaintiffs' Delay in Seeking Injunctive Relief Shows They Would
Not Be Irreparably Harmed Absent an Injunction ................... 33

    3.    Plaintiffs' Licensing of the '192 Patent Shows They Would Not Be
Irreparably Harmed Absent an Injunction ............................... 34

D.    The Balance of Hardships Tips Decidedly in Favor of Defendants .................... 35

E.    The Public Interest is Best Served by Denying the Injunction ........................... 36

F.    Security in the Amount of at Least $13,500,000 is Appropriate Should
Preliminary Injunctive Relief Be Granted .......................................... 37

IV.    CONCLUSION ........................................................................................... 37

# TABLE OF AUTHORITIES

Page

## CASES

*Abbott Labs. v. Andrx Pharms., Inc.*,
  452 F.3d 1331 (Fed. Cir. 2006)..................................................................................33, 36

*Alloc, Inc. v. ITC*,
  342 F.3d 1361 (Fed. Cir. 2003)...........................................................................................19

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
  239 F.3d 1343 (Fed. Cir. 2001)....................................................................................25, 26

*Anton/Bauer, Inc. v. PAG, Ltd.*,
  329 F.3d 1343 (Fed. Cir. 2003)...........................................................................17, 18, 27

*Automated Merch. Sys. v. Crane Co.*,
  357 Fed. Appx. 297 (Fed. Cir. 2009)..................................................................................31

*Bell Atl. Network Servs. v. Covad Commc'ns Group, Inc.*,
  262 F.3d 1258 (Fed. Cir. 2001)....................................................................................19, 20

*Chimie v. PPG Indus.*,
  402 F.3d 1371 (Fed. Cir. 2005)...........................................................................................19

*Computer Docking Station Corp. v. Dell, Inc.*,
  519 F.3d 1366 (Fed. Cir. 2008)....................................................................................19, 21

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*,
  269 F.3d 1149 (10th Cir. 2001) ..........................................................................................37

*DSU Med. Corp. v. JMS Co.*,
  471 F.3d 1293 (Fed. Cir. 2006)....................................................................................23, 24

*Dynacore Holdings Corp. v. U.S. Philips Corp.*,
  363 F.3d 1263 (Fed. Cir. 2004)...........................................................................................23

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006)..........................................................................................31, 33, 35

*Helifix Ltd. v. Blok-lok, Ltd.*,
  208 F.3d 1339 (Fed. Cir. 2000)...........................................................................................25

*High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*,
  49 F.3d 1551 (Fed. Cir. 1995)......................................................................................31, 35

*Hybritech, Inc. v. Abbott Laboratories*,
  849 F.2d 1446 (Fed. Cir. 1988)....................................................................................33, 34

*In re Napier*,
  55 F.3d 610 (Fed. Cir. 1995)...............................................................................................28

**TABLE OF AUTHORITIES**
(continued)

Page

*Jack Guttman, Inc. v. Kopykake Enters., Inc.*,
    302 F.3d 1352 (Fed. Cir. 2002)...............................................................17, 35

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (U.S. 2007)........................................................................29, 30

*Mallinckrodt, Inc. v. EZ-EM INC.*,
    670 F. Supp. 2d 349 (D. Del. 2009).......................................................23, 24

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
    357 F.3d 1340 (Fed. Cir. 2004)....................................................................19

*National Steel Car, Ltd. v. Canadian Pacific Railway, Ltd.*,
    357 F.3d 1319 (Fed. Cir. 2004)....................................................................17

*Nutrition 21 v. United States*,
    930 F.2d 867 (Fed. Cir. 1991)......................................................................32

*Pharmacia & Upjohn Co. v. Mylan Pharms., Inc.*,
    170 F.3d 1373 (Fed. Cir. 1999)....................................................................22

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005), *cert. denied*, 126 S. Ct. 1332 (2006) ....................................18

*Playtex Prods., Inc. v. Procter & Gamble Co.*,
    400 F.3d 901 (Fed. Cir. 2005)......................................................................22

*Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*,
    237 F.3d 1359 (Fed. Cir. 2001)....................................................................18

*Purdue Pharma L.P. v. Endo Pharms., Inc.*,
    438 F.3d 1123 (Fed. Cir. 2006)....................................................................19

*Titan Tire Corp. v. Case New Holland, Inc.*,
    566 F.3d 1372 (Fed. Cir. 2009)....................................................................25

*Verdegaal Bros. v. Union Oil Co. of California*,
    814 F.2d 628 (Fed. Cir. 1987)......................................................................26

*Voile Mfg. Corp. v. Dandurand*,
    551 F. Supp. 2d 1301 (D. Utah 2008)...........................................17, 31, 32, 33

*Winter v. NRDC, Inc.*,
    129 S. Ct. 365 (2008) .......................................................................... passim

**STATUTES**

35 U.S.C. § 102...............................................................................2, 13, 26, 28

35 U.S.C. § 102(e) ....................................................................................15, 16

35 U.S.C. § 103...............................................................................2, 13, 29, 30

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

35 U.S.C. § 271(c) ...................................................................................24

**OTHER AUTHORITIES**

U.S. Patent 2,285,083 ..............................................................................13

U.S. Patent 6,753,756 ..............................................................................16

U.S. Patent No. 7,519,192.................................................................. passim

**RULES**

Fed. R. Civ. P. 11 ............................................................................... passim

Fed. R. Civ. P. 15(a)(1)...............................................................................8

Fed. R. Civ. P. 65(c) ................................................................................37

## I.     INTRODUCTION AND STATEMENT OF ISSUES

Defendants Jerry Leigh of California, Inc. ("Jerry Leigh"), Kohl's Department Stores, Inc. ("Kohl's"), JC Penney Corporation, Inc. ("JC Penney"), Rusty Licensing, Inc. ("Rusty"), Hot Topic Merchandising, Inc. ("Hot Topic"), and Sun Coast Merchandise Corporation ("Sun Coast") (collectively, "Defendants") respectfully submit this Memorandum of Points and Authorities in Opposition ("Opposition")[1] to the Motion for Temporary Restraining Order and Preliminary Injunction ("Motion") filed by Plaintiffs LL&L Innovations, LLC ("LL&L") and Lowdown Distribution, Inc. ("Lowdown") (collectively, "Plaintiffs"). This Opposition is supported by the concurrently submitted Declarations of Andrew Leigh, Jeff Silver and Shawn Hansen.

Plaintiffs' Motion was not brought in good faith. With respect to likelihood of success on the merits, Plaintiffs bear the burden to show that they will likely prove infringement and that Defendants' challenges to the validity of the asserted patent, U.S. Patent No. 7,519,192 ("'192 patent"), lack substantial merit. Not only have Plaintiffs failed to meet this burden, but they have no chance of succeeding on the merits because the '192 patent is, as a matter of law, neither infringed nor valid, as explained herein.

The '192 patent claims are directed to a hooded garment (sometimes referred to as a "hoodie") where the conventional hoodie drawstring is replaced by earphone wire such that the wire itself acts as the drawstring. Given that hoodies and earphones were well known, the use of the earphone wire as the drawstring was critical to the allowance of the claims. Claim 1 of the '192 patent expressly requires, *inter alia*, that an earphone wire "acts as a drawstring for the

---

[1] During the Status Conference held on September 2, 2010, the Court granted Defendants leave to exceed the page limits under DUCivR 7-1 in this brief.

hood".  The accused products ("HB3 Technology™ products") do not infringe the '192 patent literally or equivalently as a matter of law because they do not meet this key limitation of claim 1, among other reasons.

On the contrary, the HB3 Technology™ products were specifically designed to prevent the ear bud wire from acting as a drawstring because this causes excessive wear and damage to the wire and related components.  Instead, the HB3 Technology™ products include a component similar to a conventional drawstring in the form of a tubular "lanyard," which contains and protects the ear bud wire.  The tubular lanyard acts as the drawstring to tighten or close the hood opening.  But because the ear bud wire is substantially longer than the tubular lanyard within which it is contained, meaning that even when the lanyard is pulled the wire is not pulled, <u>the wire is physically prevented from acting as a drawstring by design</u>.  Because the accused products do not have a wire that "acts as a drawstring for the hood," there can be no infringement as a matter of law.

With respect to invalidity, there are multiple prior art references that expressly or inherently disclose and/or strongly suggest an earphone wire acting as a drawstring in the existing drawstring passageway of a conventional hooded garment and accordingly invalidate the '192 patent as being anticipated under 35 U.S.C. § 102 and/or obvious under 35 U.S.C. § 103.

Plaintiffs were on notice of Defendants' positions regarding noninfringement and invalidity prior to the filing of this Motion.  To make a record of notifying Plaintiffs of this information, on August 17, 2010, and again on August 25, 2010, Defendant Jerry Leigh served on Plaintiffs' counsel substantially similar Motions for Sanctions Pursuant to Federal Rule of Civil Procedure 11 ("Rule 11 Motion") explaining why the '192 patent is neither infringed nor valid as a matter of law, and including copies of invalidating prior art.  No Rule 11 Motion has

been filed with the Court, but Defendants reserve the right to file such a motion at an appropriate time.

Because Defendants notified Plaintiffs of Defendants' noninfringement and invalidity defenses prior to the filing of this Motion, in the Rule 11 Motion served on August 17, 2010, Plaintiffs bear the burden to prove these defenses lack substantial merit. Plaintiffs have failed to meet their burden.

With respect to noninfringement, Plaintiffs ignore claim construction altogether and make no effort to show the wire in the accused products meets the claim requirement that it "acts as a drawstring for the hood" of a hooded garment. As discussed below, the correct construction of this phrase is: **"The wire must be used to tighten or close the hood opening. Moveable wiring within the drawstring passageway is not wiring that acts as a drawstring."** The accused products do not meet this or any other legally correct definition.

With respect to validity, Plaintiffs stated at page 9 of their Memorandum and Points of Authority ("Memorandum") filed on August 20, 2010, that "[t]he only validity argument articulated by Defendants to date is an allegation that website advertisements for the O'Neil [sic] 'Hub' jacket invalidate the claims of the '192 patent." In fact, Jerry Leigh's previously served Rule 11 Motion included multiple prior art references forming the basis for invalidity defenses in addition to the documents discussed in Plaintiffs' Memorandum. Because Plaintiffs' failed to address these additional prior art references in their Memorandum, Plaintiffs failed to meet their burden show that Defendants' invalidity defenses based on them lack substantial merit.

Moreover, Plaintiffs cannot demonstrate the requisite irreparable harm. Plaintiffs licensing activity, lack of participation in the market, and delay in seeking injunctive relief are fundamentally inconsistent with a showing of irreparable harm. Plaintiffs allege that they will be

irreparably harmed by loss of market share and/or price erosion, but they have offered <u>no</u> evidence of any actual contracts or market share that were allegedly lost, nor of Lowdown's pricing to substantiate their allegations of price erosion.  In these circumstances, monetary damages are clearly adequate to compensate Plaintiffs should infringement of a valid patent claim be found.

Lastly, the balance of hardships tips decidedly in favor of Defendants.  In contrast to Plaintiffs' failure to demonstrate irreparable harm in the absence of an injunction, Defendants have established businesses, which, if wrongly enjoined, would stand to lose approximately $13,500,000 in direct losses, representing a value at the retail level in excess of approximately $23,000,000.  Products would have to be recalled from thousands of stores across the country.  A substantial number of employees could lose their jobs.  In addition to severe financial loss, Defendants would suffer irreparable harm to their reputations and commercial relationships if there were wrongfully enjoined.

Because Plaintiffs cannot meet their burden to show a likelihood of success on the merits and irreparable harm absent an injunction, and because the balance of hardships tips decidedly in favor of Defendants, the Motion should be denied in its entirety.

## II.    STATEMENT OF FACTS

### A.    The Parties

#### 1.    Defendants

Jerry Leigh, established in 1962, is a family-owned clothing designer, manufacturer, and brand management company.  (Silver Decl., ¶ 3.)[2]  With over 750 employees worldwide, Jerry

---

[2]  Declaration of Jeff Silver in Support of Defendants' Opposition to Motion for Temporary Restraining Order and Preliminary Injunction ("Silver Decl.").

Leigh distributes to retailers at all tiers of distribution, from boutiques to mass market, and

manufactures apparel for everyone, from toddlers to adults.  (*Id*.)

Jerry Leigh is the developer and manufacturer of the accused Hoodie Buddie™ with HB3

Technology™ products and has agreed to indemnify and defend the other Defendants against

Plaintiffs' claims for infringement of the '192 patent based on garments supplied and/or licensed

by Jerry Leigh.  (*Id*. at ¶¶ 4-11.)  Sun Coast provides sales and marketing services to Jerry Leigh.

Kohl's is a department store operating approximately 1,000 stores in 49 states.  (*Id*. at ¶

9.)  JC Penney is a department store operating approximately 1,100 stores in 49 states and Puerto

Rico.  (*Id*.)  Hot Topic is a clothing retailer operating approximately 680 Hot Topic stores

throughout the United States and Puerto Rico.  (*Id*.)  Thus, these retailer Defendants collectively

have thousands of stores in which the HB3 Technology™ products are sold nationwide. (*Id*.)

Rusty is an iconic brand in surf culture, featuring a range of garments available at leading

surf shops nationwide.  (*Id*. at ¶ 26.)  In addition to Jerry Leigh's proprietary line of Hoodie

Buddie™ products, the HB3 Technology™ lanyard is used in garments made and sold by Rusty

pursuant a license agreement that permits Rusty to use Jerry Leigh's HB3 Technology™

trademark and the underlying technology in Rusty's garments.  (Silver Decl., ¶¶ 26-27.)

**2.      Plaintiff LL&L**

In contrast to the long-established businesses of Defendants, LL&L was formed five

months ago in April 2010.  (Hansen Decl., Ex. H.)[3]  LL&L has no known products or operating

business and appears to exist solely to license the '192 patent, as its Articles of Organization set

forth the stated purpose of the business as: "Hold, market and manage intellectual property

---

[3]    Declaration of Shawn G. Hansen in Support of Defendants' Opposition to Plaintiffs' Motion
for Temporary Restraining Order and Preliminary Injunction ("Hansen Decl.").

interests." (Hansen Decl., Ex. H.)

### 3.    Plaintiff Lowdown and Mr. Zhou's Other Related Entities

Lowdown is a California corporation whose registered agent for service of process is

Peiliang Zhou, believed to be the same person as the Edward Zhou who submitted a Declaration

in support of the Motion.  (Hansen Decl., Ex. L.)  Mr. Zhou also owns and/or controls a garment

manufacturing organization with operations in China and the United States, known as "Dragon

Crowd."  According to the Dragon Crowd web page, Mr. Zhou established Dragon Crowd

Garment Inc. in Ningbo, China in 1998, and currently is listed as the "CEO & Owner" of that

entity on its website.  (Hansen Decl., Exs. I-J.)

Dragon Crowd Garment Inc. also is the name of a corporation incorporated in the State of

California.  (Hansen Decl., Ex. K.)  Mr. Zhou's Dragon Crowd Garment Inc. entities in China

and California are referred to collectively as, "Dragon Crowd".

Lowdown and Dragon Crowd both are registered to do business in the State of California

under the fictitious business name "Colorfast Apparel Inc." ("Colorfast").  (Hansen Decl., Exs.

M-N.)

As noted above, the agreement between Jerry Leigh and Rusty permits Rusty, subject to

the terms and conditions of the agreement, to have contractors make licensed products for Rusty

using the HB3 Technology™ trademark and technology. (Silver Decl., ¶ 26-27.)  Starting no

later than approximately January or February of 2010, Jerry Leigh sent multiple shipments of

samples of HB3 Technology™ products to Dragon Crowd, which Rusty contracted to

manufacture products under the agreement between Jerry Leigh and Rusty. (*Id*.)  In addition,

under the agreement between Jerry Leigh and Rusty, Jerry Leigh has supplied to Dragon Crowd

HB3 Technology™ lanyard components to be included in garments made by Dragon Crowd for

6

Rusty.  (*Id*.)

Then, at a trade show in July of 2010, representatives of Jerry Leigh observed that products being exhibited by Colorfast, a fictitious business name of Lowdown and Dragon Crowd as noted above, appeared to be Jerry Leigh's products with the Colorfast name on them, in response to which Jerry Leigh's counsel sent a letter dated July 14, 2010, demanding that Colorfast immediately cease and desist from offering illicit products.  (Hansen Decl., Ex. O.)

## B.    Procedural Background

This is the <u>second</u> action for infringement of the <u>same</u> '192 patent by the <u>same</u> HB3 Technology™ products filed with this Court by Plaintiffs' counsel since July 15, 2010.

On July 15, 2010, the day after Jerry Leigh's counsel sent the letter to Colorfast, LL&L (but not Lowdown) filed in this Court a Complaint for alleged infringement of the '192 patent based on the HB3 Technology™ products (Case No. 2:10-cv-665-DAK; hereinafter, the "First Case").  (Hansen Decl., Ex.A.)  The Complaint in the First Case was not served on any Defendant.

Based on Jerry Leigh's observations at the above-referenced trade show in July 2010 (and subsequent trade shows), on August 13, 2010, Jerry Leigh filed in the U.S. District Court for the Central District of California a Complaint against Lowdown and Dragon Crowd alleging claims for false designation of origin, false advertising, unfair competition, and common law misappropriation.  (Hansen Decl., Ex. G.)

Because the HB3 Technology™ products do not infringe the '192 patent and the '192 patent is invalid as a matter of law, and to make a record of notifying Plaintiffs of the reasons why, on August 17, 2010, Jerry Leigh's counsel caused to be served on Plaintiffs' counsel a Rule 11 Motion in the First Case setting forth Defendants' preliminary positions regarding

noninfringement and invalidity, including copies of the prior art forming the bases of Defendants' invalidity defenses.  (Hansen Decl., Ex. D.)

In response, on August 20, 2010, Plaintiffs' counsel filed a Notice of Dismissal Without Prejudice in the First Case.  (Hansen Decl., Ex. E.)  Separately the same day, Plaintiffs' counsel filed the instant Motion and the Complaint in this action, asserting the same claims that were asserted in the Complaint in the First Case, as well as adding Lowdown as a plaintiff and Sun Coast as a defendant.  (Docket Nos. 2, 4-7.)

Because Plaintiffs' Complaint in the First Case was never served, the changes to Plaintiffs' claims and addition of parties could have been made as a matter of right in the First Case pursuant to FRCP 15(a)(1).  Plaintiffs have not explained the reasons for the dismissal and serial refiling of their claims.  However, because Jerry Leigh's Rule 11 Motion in the First Case was directed to the Complaint in the First Case, the dismissal of that Complaint mooted that motion.  Thus, on August 25, 2010, Jerry Leigh served on Plaintiffs' counsel a Rule 11 Motion in this action, again putting Plaintiffs on notice of Defendants' preliminary positions on noninfringement and invalidity, as well as pointing out that Plaintiffs' statements at page 9 of their Memorandum failed to address invalidating prior art that was included in the first Rule 11 Motion.  (Hansen Decl., Ex. F.)

### C.    The Patent-in-Suit

The Complaints in the First Case and this action both assert a single claim for relief for alleged infringement of the '192 patent, entitled "Wired clothing and earphones," filed on September 13, 2005, and issued on April 14, 2009.  (*See* Hansen Decl., Ex. A, Complaint in the First Case; *see also* Docket No. 2, Complaint in this action.)   The instant Motion asserts only claim 1 of the '192 patent, which is illustrated in Figure 1 of the '192 patent, reproduced below

at right.  Claim 1 states:

1.  A combined garment and earphones, comprising:

a garment having a hood sized to be selectively worn over a user's head, the hood including an elongate internal passageway along the border of the hood, and having left and right apertures at each end of the passageway; [and]



U.S. Patent     Apr. 14, 2009     Sheet 1 of 5     US 7,519,192 B1

FIGURE 1

earphones, comprising: a conductive wire assembly passing through the elongate internal passageway and having left and right lengths of wire exiting through the left and right apertures, respectively, **wherein at least a portion of the conductive wire assembly is slideable within the passageway, and acts as a drawstring for the hood**; a left and a right earpiece configured to be worn in close proximity to the left and right ears of the user, the earpieces being electronically coupled to the left and right lengths of wire, respectively, and including transducers for emitting audio into the ears of the user; and a connection between the earphones and an audio device for supplying an audio signal from the audio device to the earphones.

('192 patent, col. 8, lines 22-43 (emphasis added); FIG. 1 (at right).)

In many words, claim 1 recites the simple combination of a prior art hooded garment and a prior art set of earphones in which the earphone wire passes through the existing drawstring passageway of the hood and "acts as a drawstring for the hood."  ('192 patent, col. 8, lines 22-43 (claim 1); *see also* col. 2, line 52 to col. 3, line 55 (written description of FIG. 1).)

Not only is it admitted in the '192 patent that hoodies with drawstrings and earphones with wires and a connection for audio devices were known in the prior art, *see* '192 patent col. 3, lines 4-6 and 20-49, but the '192 patent further expressly admits at col. 1, lines 39-46, that it was known in the prior art to pass earphone wiring through passageways in clothing to avoid entanglements and position the earphones near a user's ears.  In other words, it is admitted within

the '192 patent that all or virtually all of the subject matter of claim 1 was known in the prior art.

During prosecution of the '192 patent before the U.S. Patent & Trademark Office ("PTO"), the Examiner indicated that he considered the allowable subject matter to be, "the unique feature of having a conductive wire slideable through the passageway, and acting as a drawstring for a hooded garment." (Prosecution History File, Exhibit 1 at pp. 122-125, Notice of Allowance dated December 22, 2008.) This critical feature is referred to hereinafter as the "Earphone Wire Drawstring" feature or limitation.

As discussed above and in further detail below, the Earphone Wire Drawstring feature was expressly or inherently disclosed in and/or strongly suggested by numerous prior art references. The '192 patent therefore is invalid. In any event, Defendants' accused products do not meet the Earphone Wire Drawstring limitation and thus do not infringe the '192 patent.

**D.     The HB3 Technology™ and Hoodie Buddie™ Products**

Even if the '192 patent were valid, which it is not, Defendants do not infringe the patent as a matter of law. Jerry Leigh has developed an inventive machine-washable lanyard featuring integrated ear buds and wiring to connect to an audio device, such as an iPhone or other mp3 player, which Jerry Leigh sells under the trademark HB3 Technology™. (Leigh Decl., ¶ 5.)[4] The HB3 Technology™ products provide users with the ease and convenience of not having to remember to bring separate ear buds to listen to music on their iPhone or other audio device while wearing a garment incorporating the HB3 Technology™. (*Id.*)

Among other products, the HB3 Technology™ is used in Jerry Leigh's proprietary brand of "Hoodie Buddie™" products, in which the HB3 Technology™ lanyard is built into the hood

---

[4] Declaration of Andrew Leigh in Support of Defendants' Opposition to Motion for Temporary Restraining Order and Preliminary Injunction ("Leigh Decl.").

of a hoodie, appearing similar to conventional drawstrings, with wiring inside the garment to connect the ear buds to an audio device in a pocket of the garment. (*Id.*, ¶ 7.)  Jerry Leigh introduced the first products in the Hoodie Buddie™ line in the fall of 2009 and since that time has invested in an extensive marketing and public relations campaign, including on the Internet, on television, and in print. (*Id., ¶¶* 7-8; Silver Decl., ¶¶ 6-8.)

The design and construction of the HB3 Technology™ lanyard and ear bud enclosures protects the ear bud electronics and wiring from physical abuse and thus helps enable them to better survive the shock of machine wash cycles, unlike previously known waterproof earphones. (Leigh Decl., ¶ 6.)  In contrast to the requirement of all of the claims of the '192 patent that the wire connecting the earphones "acts as a drawstring for the hood," the HB3 Technology™ lanyard is specifically designed to <u>avoid</u> using the wire as a drawstring. (Leigh Decl., ¶ 9-11 and Exhibit A.)

The HB3 Technology™ lanyard was designed to protect the wire from being pulled to help prevent damage and reduce wear on the electronic connections and components. (Leigh Decl., ¶ 9.)  If the wire itself is used to act as a drawstring, the tension of pulling on the wire can damage and/or break the wire and related electronic connections and components. (*Id.*, ¶ 10.)

To avoid these problems, the wire in the HB3 Technology™ lanyard is substantially longer than the lanyard within which it is loosely contained, so there is always slack on the wire within the lanyard, as illustrated in the below diagram of the current design of the HB3 Technology™ lanyard. (*Id.*; Exhibit A.)



Enlarged View

1. Pc 1
2. Pc 2
3. Pc 3
4. Silicone cap
5. Tubular lanyard
6. Wire
7. Barrel
8. Fabric fin
9. Jack Plug wire
10. Jack Plug

As can be seen in the diagram above, the wire within the HB3 Technology™ lanyard, denoted by reference numeral 6, is substantially longer than the lanyard, denoted by reference numeral 5. (*Id.*, ¶ 11.)  As a result of this construction, the lanyard, not the wire, bears the load when the lanyard is pulled. (*Id.*)  As such, the wire within the HB3 Technology™ lanyard physically cannot act as a drawstring because the wire cannot be pulled to tighten or close the opening of the hood. (*Id.*)  Accordingly, there can be no infringement of the '192 patent literally or equivalently, as a matter of law.

In addition, there can be no indirect infringement because the HB3 Technology™ lanyard can be used in many different kinds of garments, not just hooded garments. (Silver Decl., ¶ 5; Leigh Decl., ¶ 12.)  As an example, the HB3 Technology™ can be used in garments that do not have a hood, including but not limited to, by running the lanyard around the collar of a garment such as a blazer or other jacket without a hood. (Leigh Decl., ¶ 12.)  In addition, the HB3

Technology™ lanyard is suitable for use in hooded garments that are expressly designed not to have a functional drawstring in the hood, including but not limited to, in hooded garments having drawstrings secured at or near the point where they exit the hood to prevent the drawstring from tightening or closing the hood opening.  (*Id.*)  Such designs are desirable, among other reasons, because they further protect the ear bud wire against damage and wear from being pulled.  (*Id.*)

      **E.**    **The Prior Art**

The '192 patent is invalid due to anticipation under 35 U.S.C. § 102 and/or obviousness under 35 U.S.C. § 103 because the subject matter claimed in the '192 patent, including the Earphone Wire Drawstring feature, was expressly or inherently disclosed and/or strongly suggested in numerous prior art patents, products, and printed publications.

As shown in Exhibit R, U.S. Patent 2,285,083, entitled "Two-way Radio Garment," which was filed on March 30, 1940, and issued on June 2, 1942, the notion of integrating earphones and wiring in garments is a very old concept indeed.  (Defendants' Prior Art Exhibit 2-N.)  In January of 2004, more than a year and a half before the application for the '192 patent was filed on September 13, 2005, the sportswear manufacturer O'Neill announced a hooded jacket called "The Hub" that included the Earphone Wire Drawstring feature.

The image reproduced below from Exhibit E, an article dated January 16, 2004, regarding the O'Neill jacket on the website Cellular Online ("January 2004 Cellular Online Article"), discloses each and every limitation of claim 1 of the '192 Patent, including the Earphone Wire Drawstring limitation.  (Defendants' Prior Art Exhibit 2-A.)

As can be seen at right, the image of the O'Neill jacket in the January 2004 Cellular Online Article discloses a hooded garment with the drawstring passageway clearly visible along the border of the hood and earphone wires emerging from that passageway, acting as a drawstring for the hood.  (Defendants' Prior Art Exhibit 2-A.)  Thus, the January 2004 Cellular Online Article discloses the Earphone Wire Drawstring feature, as well as the other limitations of claim 1 of the '192 patent.







Additional views of the O'Neill jacket from the website Gizmag are shown above, which also clearly disclose the earphone wire emerging from the drawstring passageway on the hood,

acting as a drawstring for the hood.  (Defendants' Prior Art Exhibits 2-A through 2-D; *see also*

Defendants' Prior Art Exhibits 2-E through 2-I.)

In addition, the Earphone Wire

Drawstring feature, as well as the other

limitations of claim 1 of the '192 patent, is

disclosed in U.S. Patent Application

Publication 2006/0075537 ("Tsai

Application"), which is effective as prior art

under  35 U.S.C. § 102(e) as of its filing date

of October 8, 2004.  (Defendants' Prior Art

Exhibit 2-L; FIG. 7 shown at right.)



Patent Application Publication   Apr. 13, 2006   Sheet 7 of 13      US 2006/0075537 A1

Fig.7

The Tsai Application discloses a jacket or pullover in which an earpiece set E′ having

two earpiece wires E1′ and E2′ are integrated between inner and outer layers of the hood 50′ of

the garment and emerge through earpiece openings 58′ and 59′, *i.e.*, the Earphone Wire

Drawstring feature.  ( Defendants' Prior Art Exhibit 2-L, FIGS. 7, 8 and 11; ¶ [0054]; *see also*

¶¶ [0011], [0016], [0021].)

The Earphone Wire Drawstring feature also is disclosed in U.S. Patent Application

Publication 2006/0147052 ("Wikel Application"), a copy of which is attached as Exhibit Q,

which is effective as prior art under  35 U.S.C. § 102(e) as of its filing date of January 4, 2005.

(Defendants' Prior Art Exhibit 2-M.)  The Wikel Application describes the Earphone Wire

Drawstring feature as an alternative embodiment of the cap shown in Figure 7, as follows: "an

exemplary audio headset comprising first and second earphone portions interconnected by a

lanyard is installed within a garment in the exemplary form of a cap 700.  Alternatively, the cap

may be a hood integrated with a coat or other clothing article."  (Defendants' Prior Art Exhibit 2-M, ¶ [0021]; *see also*  FIG 7.)

Also highly relevant is U.S. Patent 6,753,756 ("Marmaropoulos Patent"), a copy of which is attached as Exhibit S, entitled "Control Device for Wearable Electronics," which is effective as prior art under 35 U.S.C. § 102(e) as of its priority filing date of January 11, 2001.  (Defendants' Prior Art Exhibit 2-O.)  Figure 1 of the Marmaropoulos Patent, reproduced at right, discloses a hooded garment 10 with earphones 20 incorporated in the hood 12. (Defendants' Prior Art Exhibit 2-O, FIG. 1; *see also* col. 2, lines 22-60.)



U.S. Patent          Jun. 22, 2004      Sheet 1 of 2          US 6,753,756 B2

FIG. 1

The Marmaropoulos Patent further disclosed two cords 22, 24, ending in toggles 26, 28, which are integrated within the garment 10 and emerge through eyelets 30, 32 near the location of  traditional drawstrings to provide controls for a built-in radio 16.  (*Id.*)  Although different than the configuration claimed in claim 1 of the '192 patent, the Marmaropoulos Patent demonstrates that the art of integrating electronic wiring in clothing was advanced long before the application for the '192 patent was filed.

III.     **THE MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION SHOULD BE DENIED IN ITS ENTIRETY**

A.     **Applicable Legal Standards**

The U.S. Supreme Court recently emphasized that, "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 129 S. Ct. 365, 376 (2008) (emphasis added).  The Federal Circuit likewise has held that a preliminary injunction for patent infringement is "drastic and extraordinary remedy that is not to be routinely granted." *National Steel Car, Ltd. v. Canadian Pacific Railway, Ltd.*, 357 F.3d 1319, 1324 (Fed. Cir. 2004); *see also Voile Mfg. Corp. v. Dandurand*, 551 F. Supp. 2d 1301, 1306 (D. Utah 2008) (this Court reviewing the recent case law regarding preliminary injunctions in patent cases).

In ruling on a motion for a preliminary injunction for patent infringement, a court must consider four factors: (1) the moving party's reasonable likelihood of success on the merits; (2) whether the moving party will suffer irreparable harm if a preliminary injunction is not granted; (3) whether the balance of hardships tips in favor of the moving party; and (4) whether the public interest favors the grant of a preliminary injunction. *Anton/Bauer, Inc. v. PAG, Ltd.*, 329 F.3d 1343, 1348 (Fed. Cir. 2003).

The Court must consider all four factors before granting a preliminary injunction, while the Court may deny a preliminary injunction if the moving party fails to make a showing on any one of the four factors, particularly the first two. *Jack Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1356 (Fed. Cir. 2002).

Plaintiffs have offered nothing here but unsupported factual conclusions regarding possible irreparable harm they may suffer absent a preliminary injunction, which is insufficient as a matter of law.  Plaintiffs also have failed to show a likelihood of success on the merits.

17

Either one of these failures is independently fatal to Plaintiffs' request for preliminary injunctive relief. Taken together, these failures demonstrate conclusively that preliminary injunctive relief is not appropriate in this case.

**B.      Plaintiffs Failed to Show a Likelihood of Success on the Merits**

With regard to the requirement of a likelihood of success on the merits, Plaintiffs must show, in light of the burdens that will inhere at trial, that (1) they will likely prove infringement and (2) Defendants' challenges to the validity and enforceability of the '192 patent "lack substantial merit." *Anton/Bauer*, 329 F.3d at 1348, citing *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1363 (Fed. Cir. 2001). The proper construction of the claim language is the first step in the analysis of these issues.

**1.      Claim Construction[5]**

It is a "bedrock principle" of patent law that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005), *cert. denied*, 126 S. Ct. 1332 (2006). In general, the ordinary meaning of the language of the claims of the '192 patent is readily apparent. *See Id*. at 1314. However, as discussed below, the arguments made to obtain the issuance of the '192 patent expressly disclaimed wiring that is simply moveable within a passageway and narrowed the scope of the claims to require that the wiring must actually be used to tighten or close the hood opening.

---

[5]   Defendants expressly reserve the right to assert other claim construction positions as this matter progresses, including but not limited to, in light of information obtained in discovery and in response to arguments made by Plaintiffs.

          **a.**      **The Claim Limitation "Acts as a Drawstring for the Hood"**
                        **Should be Construed to Mean: "The Wire Must be Used to**
                        **Tighten or Close the Hood Opening.  Moveable Wiring Within**
                        **the Drawstring Passageway is Not Wiring That Acts as a**
                        **Drawstring."**

Statements made during prosecution of a patent affect the scope of the claims.  *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374-1375 (Fed. Cir. 2008).   Claims should not be construed "one way in order to obtain their allowance and in a different way against accused infringers." *Chimie v. PPG Indus.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005).  As discussed further below, the express disclaimers and definitions provided to the PTO Examiner during prosecution of the '192 patent mandate the following construction of the claim limitation "acts as a drawstring for the hood":

      **"The wire must be used to tighten or close the hood opening.  Moveable**
      **wiring within the drawstring passageway is not wiring that acts as a**
      **drawstring."**

          **b.**      **The Literal Scope of the Earphone Wire Drawstring**
                        **Limitation is Limited by Statements Made During Prosecution**
                        **of the '192 Patent**

"[A] patentee may limit the meaning of a claim term by making a clear and unmistakable disavowal of scope during prosecution."  *Computer Docking Station*, 519 F.3d at 1374-1375, citing *Purdue Pharma L.P. v. Endo Pharms., Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006).  A patentee can do so, for example, by clearly characterizing the invention in a way to try to overcome rejections based on prior art.  *Id.*, citing *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349 (Fed. Cir. 2004); *Alloc, Inc. v. ITC*, 342 F.3d 1361, 1372 (Fed. Cir. 2003); *Bell Atl. Network Servs. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1273 (Fed. Cir. 2001).

The Federal Circuit explained in *Computer Docking Station* that the doctrine of prosecution disclaimer "protects the public's reliance on definitive statements made during

prosecution" by "precluding patentees from recapturing through claim interpretation specific

meanings clearly and unmistakably disclaimed during prosecution." *Id.* (citations omitted). As

noted above, in order to obtain the '192 patent, the inventors submitted in "Amendment A" a

number of arguments to the PTO Examiner that clearly and unmistakably disclaimed subject

matter and thus limited the scope of the claims.   (Prosecution History File, Exhibit 1 at pp. 92-

101, "Amendment A," dated June 10, 2008.)

     In "Amendment A," LL&L's inventors

sought to distinguish the prior art reference *Eves* on

the basis that it failed to "teach or suggest wiring

that 'acts as a drawstring' as claimed in applicants'

claim 1." (Prosecution History File, Exhibit 1 at pp.

92-101, "Amendment A," dated June 10, 2008.)

With reference to Figures 7 and 8 of *Eves*,

reproduced at right, LL&L's inventors admitted that

*Eves* disclosed moveable wiring within a

passageway, but in order to distinguish the reference

they argued that this was not wiring that "acts as a

drawstring".



     The above Figure 7 of *Eves* is virtually identical to the "Tillbury Figure 5" reproduced

and discussed on page 10 of Plaintiffs Memorandum.  During prosecution of the '192 patent,

LL&L's inventors argued to the PTO Examiner:

> *Eves* teaches wiring that is moveable within the internal passageways in the
> clothing.  **Moveable wiring within a passageway is not wiring that acts as a**
> **drawstring**.  The moveable wiring disclosed in *Eves* serves to minimize the

amount of loose cable. In one embodiment shown in figures 7 and 8 in *Eves* this wiring emerges "discretely from the collar close to the user's ears such that there is a minimum of loose cable." ***Eves* does not teach or suggest that this wiring be used to tighten or close an opening in the clothing**. The disclosure does not show or explain that the wiring goes around the periphery of the collar so that the wiring could possibly be used as a drawstring.

(*Id.*, pp. 98-99 (emphasis added).)

These arguments make a clear and unmistakable disavowal of claim scope that should be reflected in the Court's construction of the claims. *Computer Docking Station*, 519 F.3d at 1374-1375. LL&L's inventors expressly disavowed coverage of wiring that is merely moveable within a passageway around the periphery of an opening in a garment because this subject matter was anticipated by *Eves*. Rather, as noted above, to distinguish *Eves*, LL&L's inventors argued that wiring only "acts as a drawstring" as required in the claims if it is "used to tighten or close an opening". The PTO Examiner indicated in the Notice of Allowance that this feature was the reason for allowing the claims of the '192 patent. (Prosecution History File, Exhibit 1 at pp. 123, Notice of Allowance dated December 22, 2008.)

Accordingly, because the claims must be construed the same way against accused infringers as they were construed to obtain their allowance, the claim limitation "acts as a drawstring for the hood" should be construed as set forth above. Otherwise, LL&L improperly could recapture through claim interpretation specific meanings that were clearly and unmistakably disclaimed during prosecution. *Computer Docking Station*, 519 F.3d at 1374-1375.

    c.  **Prosecution History Estoppel Precludes Application of the Doctrine of Equivalents**

In addition, Plaintiffs are estopped from asserting infringement under the doctrine of equivalents to encompass subject matter beyond the literal scope of the claims. "Prosecution

history estoppel precludes a patentee from obtaining under the doctrine of equivalents coverage of subject matter that has been relinquished during the prosecution of its patent application." *Pharmacia & Upjohn Co. v. Mylan Pharms., Inc.*, 170 F.3d 1373, 1376 (Fed. Cir. 1999).  A number of activities during prosecution may give rise to prosecution history estoppel, including arguments made to obtain allowance of the claims at issue.  *Id.*

Having distinguished the *Eves* prior art reference, which admittedly disclosed wiring moveable within a passageway around the periphery of the collar of a jacket, on the grounds that it allegedly failed to include the Earphone Wire Drawstring limitation because it did not show that the wiring was "used to tighten or close [the] opening," Plaintiffs expressly disclaimed all equivalents for this claim limitation.  *Pharmacia & Upjohn*, 170 F.3d at 1376.  Accordingly, prosecution history estoppel precludes Plaintiffs from asserting the doctrine of equivalents with respect to the Earphone Wire Drawstring limitation.

> **2.      The HB3 Technology™ Products Do Not Infringe as a Matter of Law Because They Do Not Include A Wire That "Acts as a Drawstring for the Hood"**

"To prove infringement, the patentee must show that the accused device meets each claim limitation, either literally or under the doctrine of equivalents."  *Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 906 (Fed. Cir. 2005).

> **a.      There is No Direct Infringement as a Matter of Law**

As discussed above, the HB3 Technology™ products are specifically designed to <u>prevent</u> using the ear bud wire as a drawstring to protect the wire and associated electronic connections from wear and damage.  (*See* Leigh Declaration ¶¶ 6-8.)  The HB3 Technology™ lanyard physically prevents the wire from being pulled by design.  Thus, the wire within the HB3 Technology™ lanyard cannot act as a drawstring because the wire cannot be pulled to tighten or

close the opening of the hood, as the inventors argued to the PTO Examiner is required in order

for the wire to "act as s drawstring". (*Id*. at ¶ 7.) As such, the wire within the HB3

Technology™ lanyard is similar to the wire in the *Eves* prior art reference, in that it is moveable

within a passageway around the periphery of an opening but does not "act as a drawstring"

within the meaning of the claim as construed by the inventors to the PTO Examiner because it is

not used to tighten or close the opening of the hood.

### b. Plaintiffs Have Not Alleged Facts Sufficient To State a Claim for Infringement by Inducement

Because the HB3 Technology™ lanyard can be used in many different kinds of garments,

not just hooded garments, *see* Leigh Declaration, ¶ 8, and because there is no allegation nor

competent evidence of the state of mind on the part of Defendants that is required for indirect

infringement, there can be no infringement by inducement or contributory infringement. *See,*

*e.g., DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1297 (Fed. Cir. 2006) (en banc).

To properly state a claim for inducing infringement a plaintiff is required to allege that

the "defendant possessed the requisite knowledge or intent to be held vicariously liable."

*Mallinckrodt, Inc. v. EZ-EM INC.,* 670 F. Supp. 2d 349, 354 (D. Del. 2009) (quoting *Dynacore*

*Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1273 (Fed. Cir. 2004)). There certainly

can be no presumption that Defendants possess the requisite state of mind for indirect

infringement because, among other reasons, the HB3 Technology™ lanyard can be used in many

different kinds of garments. (Leigh Decl., ¶ 8.)

In *Mallinckrodt*, the Court dismissed claims for inducing infringement because the

plaintiff didn't "specifically allege that Defendants had knowledge of the [patent-in-suit] at the

time they were committing the allegedly infringing activities . . . [n]or does [the complaint]

contain sufficient facts on which the Court can reasonably infer an allegation that Defendants possessed such knowledge.  Further, Plaintiffs do not specifically allege any intent to induce infringement."  *Mallinckrodt, Inc.*, 670 F. Supp. 2d at 354, citing *DSU*, 471 F.3d at 1304.  The same is true of Plaintiffs' unsubstantiated attorney arguments at pages 7-8 of their Memorandum. Plaintiffs attorney arguments do not even allege that Defendants had the requisite knowledge of the '192 patent nor specific intent to induce infringement of the patent.  On the contrary, the noninfringing design of the HB3 Technology™ lanyard demonstrates that Defendants intend **not** to infringe the '192 patent.  There can be no infringement by inducement under these circumstances as a matter of law.

> c.   **Plaintiffs Have Not Alleged Facts Sufficient To State a Claim for Contributory Infringement**

Similarly, to establish contributory infringement, 35 U.S.C. § 271(c) requires Plaintiffs to prove that Defendants sold "a component of a patented [device] . . . constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use."  35 U.S.C. § 271(c) (emphasis added).  The fact that the HB3 Technology™ lanyard is suitable for substantial noninfringing uses is fatal to any claim for contributory infringement.  (Leigh Decl., ¶ 8.)

Further, the *Mallinckrodt* Court observed that liability for contributory infringement requires "a showing that the alleged contributory infringer knew that the combination for which his component was especially designed was both patented and infringing."  *Mallinckrodt*, 670 F. Supp. 2d at 354-55.  Plaintiffs have not shown and cannot show that Defendants knew that the HB3 Technology™ lanyard was especially designed to infringe because there are substantial

noninfringing uses of the HB3 Technology™ lanyard.  (Leigh Decl. ¶ 8.)  Accordingly, Plaintiffs

cannot establish liability for contributory infringement as a matter of law.

> **3.**     **Claim 1 of the '192 Patent is Invalid as Being Anticipated and/or
>          Obvious Because Numerous Prior Art References Expressly or
>          Inherently Disclose and/or Strongly Suggest the Earphone Wire
>          Drawstring Limitation**

Validity challenges during preliminary injunction proceedings can be successful, that is,

they may raise substantial questions of invalidity, on evidence that would not suffice to support a

judgment of invalidity at trial.  *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343,

1358 (Fed. Cir. 2001), citing *Helifix Ltd. v. Blok-lok, Ltd.*, 208 F.3d 1339, 1352 (Fed. Cir. 2000).

As the Federal Circuit explained in *Amazon.com*:

> In resisting a preliminary injunction, however, one need not make out a case of
> actual invalidity. Vulnerability is the issue at the preliminary injunction stage,
> while validity is the issue at trial. The showing of a substantial question as to
> invalidity thus requires less proof than the clear and convincing showing
> necessary to establish invalidity itself.

*Id*. at 1359.

While the evidentiary burdens at the preliminary injunction stage track the burdens at

trial, importantly, the ultimate question before the trial court is different. *Titan Tire Corp. v. Case*

*New Holland, Inc.*, 566 F.3d 1372, 1377 (Fed. Cir. 2009).  As the Federal Circuit reiterated its

prior holdings in *Titan Tire*,

> the trial court 'does not resolve the validity question, but rather must . . . make an
> assessment of the persuasiveness of the challenger's evidence, recognizing that it
> is doing so without all evidence that may come out at trial.' Instead of the alleged
> infringer having to persuade the trial court that the patent is invalid, at this stage it
> is the patentee, the movant, who must persuade the court that, despite the
> challenge presented to validity, the patentee nevertheless is likely to succeed at
> trial on the validity issue.

*Id*. (emphasis added) (citations omitted).

With respect to the burden on Plaintiffs on the issue of invalidity, "a patentee need not

establish the validity of a patent beyond question." *Amazon.com,* 239 F.3d at 1359.  Plaintiffs

must, however, "present a clear case supporting the validity of the patent in suit."  *Id*.  Such a

case might be supported, for example, by showing that the patent in suit had successfully

withstood previous validity challenges in other proceedings.  *Id*.  Further support for such a clear

case might come from a long period of industry acquiescence in the patent's validity.  *Id*.

<u>Neither</u> of those considerations benefit Plaintiffs in this case, however, because the '192

patent has never been tested by any form of trial or other adversarial proceeding, and it was

issued just over a year before the start of this litigation.

### a.      Claim 1 of the '192 Patent is Anticipated Under 35 U.S.C. § 102

A patent claim is invalid due to anticipation under 35 U.S.C. § 102, "if each and every

element as set forth in the claim is found, either expressly or inherently described, in a single

prior art reference."  *Verdegaal Bros. v. Union Oil Co. of California*, 814 F.2d 628, 631 (Fed.

Cir. 1987); *see also* 35 U.S.C. § 102.

On August 17, 2010, Plaintiffs' counsel was put on notice of the prior art forming the

basis of Defendants' preliminary invalidity defenses when it was served with a copy of the Rule

11 Motion in the First Case, including a copy of the January 2004 Cellular Online Article as well

as numerous additional prior art references demonstrating that all the claims of the '192 patent

are invalid as being anticipated and/or rendered obvious.  (Hansen Decl., Ex. D, which included

copies of Defendants' Prior Art Exhibits 2-A through 2-O.)  Plaintiffs' counsel was again put on

notice of these invalidity defenses in the Rule 11 Motion served on August 25, 2010, in this

action.  (Hansen Decl., Ex. F, which included copies of Defendants' Prior Art Exhibits 2-A

through 2-O.)

In order to prove their entitlement to preliminary injunctive relief, Plaintiffs bear the burden to show that these invalidity defenses "lack substantial merit." *Anton/Bauer*, 329 F.3d at 1348. Plaintiffs' Memorandum attempts to rebut the invalidity defenses based on the O'Neill "Hub" jacket, but Plaintiffs offer no argument as to why Defendants' other invalidity defenses "lack substantial merit." *Id*. Accordingly, even if the Court credits Plaintiffs' arguments regarding the O'Neill "Hub" jacket, Plaintiffs failed to meet their burden to show that Defendants' other invalidity defenses, based on the prior art identified in the prior Rule 11 Motion but not addressed in Plaintiffs Memorandum, lack substantial merit.

As discussed above, it is admitted in the '192 patent that hoodies with drawstrings and earphones connected by wires were known in the prior art. ('192 patent, col. 3, lines 4-6 and 20-49.) Moreover, the Background of the Invention section of the '192 patent expressly admits that it was known in the prior art to pass earphone wiring through clothing to avoid entanglements and position the earphones near a user's ears. ('192 patent, col. 1, lines 39-46.)

Accordingly, Plaintiffs' inventors admitted within the '192 patent that all or essentially all of the subject matter of claim 1 was known in the prior art. The only alleged patentable distinction identified by the Examiner during prosecution of the '192 patent was the Earphone Wire Drawstring feature. (Prosecution History File, Exhibit 1 at p. 123, Notice of Allowance dated December 22, 2008.) However, as discussed above, numerous prior art references disclosed the Earphone Wire Drawstring feature and every other limitation of claim 1 of the '192 patent, invalidating the claim. (*See* Defendants' Prior Art, Exhibits 2-A through 2-O.)

Plaintiffs argue that the Tilbury patents cited by the PTO Examiner during the prosecution of the '192 patent were "similar" to the O'Neill prior art jacket. (Memorandum, pp. 9-11.) However, unlike the O'Neill prior art jacket, neither of the cited Tilbury patents disclosed

a hooded garment with an earphone wire visibly passing through the conventional drawstring passageway of the hood.

The Tilbury patents, as well as the *Eves* reference, instead disclosed garments without hoods that, of course, also lacked the conventional drawstring passageway along the border of a hood.  In contrast, the images of the O'Neill prior art jacket in Exhibits 2-A, 2-B, and 2-C, among others, show both a hood with the conventional drawstring passageway along the border of the hood and the earphone wire visibly passing through and emerging from that passageway.

Even if the use of the earphone wire in the O'Neill prior art jacket as a drawstring is not expressly described in the text of the exhibits, that subject matter is nevertheless inherently disclosed in the images.  The express, implicit, and inherent disclosures of a prior art reference may be relied upon to invalidate claims under 35 U.S.C. §§ 102 or 103. "The inherent teaching of a prior art reference, a question of fact, arises both in the context of anticipation and obviousness." *In re Napier*, 55 F.3d 610, 61 (Fed. Cir. 1995).

The images of the O'Neill Hub jacket included in Exhibits 2-A, 2-B, and 2-C expressly show the earphone wire passing through the conventional drawstring passageway along the border of the hood.  This inherently discloses use of the wire as a drawstring.

In addition to the documents regarding the O'Neill prior art jacket, the Tsai Application discloses the Earphone Wire Drawstring limitation and expressly describes that the wires are "integrated between inner and outer layers of the hood 50′ of the garment and emerge through earpiece openings 58′ and 59′". (Defendants' Prior Art Exhibit 2-L, FIGS. 7, 8 and 11; ¶ [0054]; *see also* ¶¶ [0011], [0016], [0021].)  This too inherently discloses use of the wire as a drawstring, particularly when viewed in the context of the conventional hoodie with a drawstring passageway along the border of the hood.  The Wikel Application and the Marmaropoulos Patent

28

also disclose the same or very similar subject matter.  (Defendants' Prior Art Exhibits 2-M, 2-O.)

Plaintiffs failed to provide <u>any</u> arguments to show that Defendants invalidity defenses based on the Tsai Application, the Wikel Application, and the Marmaropoulos Patent lack substantial merit.  In summary, there are multiple prior art references that expressly or inherently disclose the Earphone Wire Drawstring limitation and the remaining subject matter of claim 1 and therefore invalidate the claim due to anticipation.

**b.      Claim 1 of the '192 Patent is Obvious Under Section 103**

Even if the Court does not find anticipation because it concludes there are differences between claim 1 and the prior art, such differences are obvious under 35 U.S.C. § 103.  A patent claim can be invalid due to obviousness under 35 U.S.C. § 103 if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (U.S. 2007); 35 U.S.C. § 103.

As the Supreme Court explained in *KSR*, a "patent for a combination which only unites old elements with no change in their respective functions . . . obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men." *KSR*, 550 U.S. at 415-416.

The aforementioned admissions within the '192 patent that all of the individual elements of claim 1 were known in the prior art are independently sufficient to support a finding of obviousness under the Supreme Court's opinion in *KSR* without any need for additional prior art evidence.  ('192 patent, col. 1, lines 39-46; col. 3, lines 4-6 and 20-49.)  Nevertheless, Defendants have provided evidence demonstrating that the claimed subject matter, including the

Earphone Wire Drawstring feature, was expressly disclosed and/or strongly suggested in numerous prior art references.  (*See* Defendants' Prior Art Exhibits 2-A through 2-O.)

Even if these prior art references are determined not to describe the identical subject matter claimed in the '192 patent, which Jerry Leigh contends they do, they undeniably disclose subject matter that is extremely similar, and they demonstrate design needs and market pressures that would have led a person of ordinary skill in the art to combine admittedly known elements in the manner claimed in the '192 patent.  As the Supreme Court explained in *KSR*:

> When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp.  If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense.  In that instance the fact that a combination was obvious to try might show that it was obvious under § 103.

*KSR*, 550 U.S. at 421.

In short, to the extent anticipation is not found, the subject matter claimed in the '192 patent clearly is obvious under the standards set forth by the Supreme Court in *KSR*.

### C.    Plaintiffs Failed To Show That They Would Be Irreparably Harmed Absent a Preliminary Injunction

In addition to their failure to demonstrate a likelihood of success on the merits, Plaintiffs have failed to offer any competent evidence that they would be irreparably harmed absent a preliminary injunction.  No preliminary injunction may be issued in the absence of a showing of irreparable harm, even if the Court determines that Plaintiffs have shown a likelihood of success on the merits.

As the Supreme Court emphasized in *Winter*, the mere possibility of irreparable harm is insufficient to justify a preliminary injunction: "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an

extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id*. at 375-376.

And, as this Court held in *Voile Mfg. Corp. v. Dandurand*, 551 F. Supp. 2d 1301, 1306 (D. Utah 2008), the Supreme Court's decision in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392-94 (2006), discarded the former presumption of irreparable harm based solely on proof of infringement of a valid patent. *See also Automated Merch. Sys. v. Crane Co.*, 357 Fed. Appx. 297, 301 (Fed. Cir. 2009).

This Court explained in *Voile* that, "[t]he essence of showing irreparable harm is demonstrating an injury that money damages cannot sufficiently remedy." *Voile*, 551 F. Supp. 2d at 1307, citing *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995). Consistent with the Supreme Court's above-quoted cautions in *Winter* against granting injunctions on the basis of <u>possible</u> harm, this Court stated in *Voile* that, "Courts require more than unsupported factual conclusions to support such a finding." *Id*.

> ## 1.     Plaintiffs Identified No Specific Potential Harms to Substantiate Their Unsupported Factual Conclusions Regarding Lost Market Share and Price Erosion

The instant Motion illustrates why competent evidence is required to support a showing of irreparable harm sufficient to justify injunctive relief, much like the situation in *Voile*. In *Voile*, the patentee relied on statements in an affidavit to describe the harms it would suffer if an injunction did not issue. *Id*. The patentee's affiant stated that the accused product's presence in the market devalued and demoralized his company, made licensing of the asserted patent nearly impossible, and eroded the market share for his company's products, and he also cited diverted resources from research and development to the lawsuit. *Id.*

Here, Mr. Zhou's declaration admits that the '192 patent has been licensed to two other

entities related to Lowdown, and that the license permits LL&L to license the '192 patent to others, albeit with the consent of the licensees. (Zhou Decl., ¶ 4.) However, because no copy of the license agreement was provided, the Court cannot fully consider and corroborate his hearsay statements regarding alleged exclusivity under the license. (Zhou Decl., ¶ 4.) Even if the license truly is of an exclusive nature, this fact would mean merely that Lowdown is in a position similar to a patentee that practices its patented inventions, which still requires proof of specific irreparable harm to justify an injunction.

Mr. Zhou's Declaration alleges that Lowdown is harmed by the establishment of relationships to distribute and sell products infringing the '192 patent, but no specifics are provided regarding relationships or sales that were lost. (*Id*. at ¶ 7.) Like the situation in *Voile*, Mr. Zhou does not make clear to the Court how Lowdown is being allegedly devalued by the sale of the HB3 Technology™ products. *Voile*, 551 F. Supp. 2d at 1307. Nor does Mr. Zhou point to any customers, distributors, or potential licensees who have refused to enter agreements because of the presence of the HB3 Technology™ products in the market. *Id*. And there is no evidence before the Court regarding the sales of Lowdown's products or the overall size of the market, making it impossible to determine whether or to what extent Lowdown's market share has been eroded. *Id*.

In fact, Mr. Zhou's admission that Lowdown has not yet entered the market also admits that Lowdown has no market share to lose nor any established prices to be eroded. At bottom, Lowdown complains about a possible loss in market share. *Id*. But this type of damage alone does not amount to irreparable harm. *Id*., citing *Nutrition 21 v. United States*, 930 F.2d 867, 871-72 (Fed. Cir. 1991).

Lost market share must be proven (or at least substantiated with some evidence) in order

for it to support entry of a preliminary injunction, because granting preliminary injunctions on the basis of speculative loss of market share would result in granting preliminary injunctions "in every patent case where the patentee practices the invention." *Id*. Further, lost sales standing alone are insufficient to prove irreparable harm as a matter of law; if they were sufficient, irreparable harm would be found in every case involving a "manufacturer/patentee, regardless of circumstances." *Id*., citing *Abbott Labs. v. Andrx Pharms., Inc.*, 452 F.3d 1331, 1348 (Fed. Cir. 2006). Thus, lost sales (without more) are presumed to be compensable through damages, so they do not require injunctive relief. *Id*.

Plaintiffs have provided nothing more than unsupported factual conclusions here, which are insufficient as a matter of law to meet Plaintiffs' burden. *Voile*, 551 F. Supp. 2d at 1307. This failure of proof of irreparable harm is fatal to Plaintiffs' request for preliminary injunctive relief. *Id*.; *eBay*, 547 U.S. at 392-94; *Winter*, 129 S. Ct. at 376.

**2.      Plaintiffs' Delay in Seeking Injunctive Relief Shows They Would Not Be Irreparably Harmed Absent an Injunction**

In addition, the period of delay by a party prior to seeking a preliminary injunction is a factor to be considered by a district court in its analysis of irreparable harm. *Hybritech, Inc. v. Abbott Laboratories*, 849 F.2d 1446, 1457 (Fed. Cir. 1988). Plaintiffs' delay in seeking preliminary injunctive relief here is further evidence that they would not be irreparably harmed absent an injunction.

The '192 patent issued well over a year ago in April 2009 and, as discussed in Plaintiffs' Memorandum and Mr. Zhou's Declaration, Defendants have made no secret of aggressively marketing and distributing the accused HB3 Technology™ products since they were introduced in the fall of 2009. Indeed, Mr. Zhou admits that he has seen these advertisements and marketing

at industry trade shows, on television, on the Internet, and in print.  (Zhou Decl., ¶ 8.)

Mr. Zhou claims that Lowdown has been aware of the alleged infringement only for two months, since July 7, 2010.  (Zhou Decl., ¶ 6.)  No explanation is provided as to why the present Motion was not filed on July 15, 2010, when the complaint in the First Case was filed.  Nor is any explanation provided as to why that complaint was dismissed without ever being served.  Nor is any explanation provided as to why the Complaint in this action was not served until as late as August 31, 2010.  (*See, e.g.,* Docket No. 13, executed summons indicating Kohl's was served on August 31, 2010.)

Importantly, Mr. Zhou's related entity Dragon Crowd has known of and received multiple shipments of HB3 Technology™ products from Jerry Leigh since approximately January or February of 2010 because Dragon Crowd contracted with Rusty to manufacture HB3 Technology™ products for Rusty that included HB3 Technology™ lanyards supplied by Jerry Leigh.  (Silver Decl., ¶¶ 25-27 and Exhibits A-E.)

To the extent that Dragon Crowd is licensed under the '192 patent, then the Rusty products made by Dragon Crowd also were licensed, and this is an independent reason why infringement is impossible as a matter of law with respect to such products.

In any event, Plaintiffs' delay in seeking preliminary injunctive relief is fundamentally inconsistent with the requisite showing of irreparable harm. *Hybritech,* 849 F.2d at 1457.

### 3.    Plaintiffs' Licensing of the '192 Patent Shows They Would Not Be Irreparably Harmed Absent an Injunction

Further, the licensing of the '192 patent demonstrates that monetary damages are adequate to compensate for any infringement.  The offer of a license demonstrates that the patentee "is willing to forgo its patent rights for compensation" and "suggests that any injury

suffered by [the patentee] would be compensable in damages assessed as part of the final judgment in the case." *High Tech*, 49 F.3d at 1557.

Plaintiffs allege that the license under the '192 patent to Lowdown and "related entities" is exclusive, but no copy of the license itself or any other documentation is provided to corroborate the hearsay allegations of exclusivity in Mr. Zhou's Declaration. Plaintiffs' admissions that the '192 patent has been licensed in the past and may be licensed in the future, coupled with their failure to provide any competent evidence to support their hearsay allegations of exclusivity of the license to Lowdown and "related entities," seriously undermine their allegations of irreparable harm. Even if the license is exclusive, the fact remains that Plaintiffs have provided nothing more than unsupported factual conclusions regarding potential irreparable harms.

Accordingly, Plaintiffs have failed to offer any competent evidence establishing that they would be irreparably harmed by the denial of an injunction, and this failure is fatal to Plaintiffs' request for injunctive relief. *Jack Guttman,* 302 F.3d at 1356; *eBay*, 547 U.S. at 392-94; *Winter*, 129 S. Ct. at 376.

### D. The Balance of Hardships Tips Decidedly in Favor of Defendants

As Mr. Silver explained in his Declaration, if an injunction is granted requiring cessation of all sales and manufacturing of all HB3 Technology™ products, products would have to be taken off the shelves at the <u>thousands</u> of retail stores that currently carry the HB3 Technology™ products. (Silver Decl., ¶ 18.) An injunction thus would cause significant disruption to the businesses of Defendants Kohl's, JC Penney, and Hot Topic, who would be required to expend substantial resources and employee time to remove the products from store shelves and return them to Defendant Jerry Leigh. (*Id.*, ¶¶ 19-24.) And an injunction could cause the loss of

employment of a substantial number of employees at Jerry Leigh.  (*Id*., ¶ 18.)

In addition, Jerry Leigh would be liable for the full wholesale price paid by the retailers, and may also be liable for the difference between the retailers' sales plans and actual sales before the injunction.  (*Id*.)  Because of the short product cycles and other factors mentioned above, returned products likely would be written off as a total loss to Jerry Leigh.  (*Id*.)

An injunction also would result in the total loss by Jerry Leigh of all the costs that have already been incurred and cannot be recovered ("sunk costs") in connection with the Hoodie Buddie™ with HB3 Technology™ products, including design and development costs, outside legal fees relating to patent and trademark protection, and marketing and promotion costs.  (*Id*., ¶¶ 6-8.)

Accordingly, taking into account the cost of returns of previously sold items and freight for the returns, cancellation of currently open orders, and unsold inventory, as well as the unrecoverable "sunk costs" of development and design, intellectual property protection, and marketing and promotion, an injunction would result in direct losses to Jerry Leigh in excess of approximately $13,500,000, and would result in lost retail sales in excess of approximately $23,000,000.  (*Id*., ¶ 23.)  Beyond the direct costs of an injunction, an injunction would result in severe damage to Defendants' reputations and relationships in the industry.  (*Id*., ¶ 24.)

In these circumstances, the balance of hardships tips in favor of Defendants and against granting preliminary injunctive relief.

### E.    The Public Interest is Best Served by Denying the Injunction

In general, the public interest inquiry follows the likelihood of success of the merits; that is, the public interest is best served by enforcing patents only if they are likely valid and infringed.  *Abbott Labs.*, 452 F.3d at 1348.  As Plaintiffs did not establish a likelihood of success

on the merits, as explained above, the public interest is best served by denying the preliminary injunction.

      **F.**       **Security in the Amount of at Least $13,500,000 is Appropriate Should Preliminary Injunctive Relief Be Granted**

No preliminary injunction may issue "except upon the giving of security by the applicant, in such sums as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Tenth Circuit has stated that while the trial court has "wide discretion" in setting the amount of the preliminary injunction bond, it must make specific factual findings in setting the bond amount for the preliminary injunction. *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 269 F.3d 1149, 1158 (10th Cir. 2001).

As noted in the preceding section, an injunction would result in direct losses to Jerry Leigh in excess of approximately $13,500,000, and would result in lost retail sales in excess of approximately $23,000,000. (Silver Decl., ¶ 23.) Accordingly, in the event that the Court grants the Motion, Defendants request that security of at least $13,500,000 be required before any injunction can take effect. FRCP 65(c).

**IV. CONCLUSION**

For the above-stated reasons, Defendants respectfully request the Court to deny the Motion in its entirety. To the extent that the Motion is granted, Defendants request the Court to require security pursuant to FRCP 65(c) of at least $13,500,000 to pay the costs and damages that would be sustained by Defendants if wrongfully enjoined.

Respectfully submitted,

MANATT, PHELPS & PHILLIPS, LLP

DATED:  September 7, 2010          By:    /s/ Shawn G. Hansen_____
                                          Jill M. Pietrini
                                          Robert D. Becker
                                          Shawn G. Hansen

                                          *Attorneys for Defendants*
                                          JERRY LEIGH OF CALIFORNIA, INC.
                                          KOHL'S DEPARTMENT STORES, INC.
                                          JC PENNEY CORPORATION, INC.
                                          RUSTY LICENSING, INC.
                                          HOT TOPIC MERCHANDISING, INC.
                                          SUN COAST MERCHANDISE
                                          CORPORATION d/b/a SUN COAST

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 7th day of September, 2010, I filed the foregoing

electronically through the Court's CM/ECF system, which caused the following parties or

counsel to be served by electronic means, as more reflected on the Notice of Electronic Filing:


Charles L. Roberts                                      _____  Hand Delivery
*croberts@wnlaw.com*                             ___X___  CM/ECF system
James B. Belshe                                         ___ __  Federal Express
*jbelshe@wnlaw.com*                               _____  Email
Chad E. Nydegger
*cnydegger@wnlaw.com*
WORKMAN | NYDEGGER
1000 Eagle Gate Tower
60 East South Temple
Salt Lake City, Utah 84111

*Attorneys for Plaintiffs*
LL&L INNOVATIONS, LLC
LOWDOWN DISTRIBUTION, INC.


                                     */s/ Shawn G. Hansen*


300146672.1