IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| LL&L INNOVATIONS, LLC, and LOWDOWN DISTRIBUTION, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> JERRY LEIGH OF CALIFORNIA, INC., et al., <br><br> Defendants. | ORDER <br><br> AND <br><br> MEMORANDUM DECISION <br><br> Case No. 2:10-CV-829-TC |

In this patent infringement case, Plaintiffs LL&L Innovations LLC (patent owner) and Lowdown Distribution, Inc. (licensee) (collectively "LL&L") seek an order preliminarily enjoining the garment manufacturing and retailer defendants from making and selling products that infringe Plaintiffs' patent rights in hooded garments with integrated headphones that can be connected to, for example, mp3 players.

LL&L is the owner of U.S. Patent No. 7,519,192 (the "'192 Patent"). The '192 Patent, titled "Wired Clothing and Earphones," claims the feature of a conductive wire assembly that acts as a drawstring for a hooded garment, such as a hoodie sweatshirt. LL&L accuses Jerry Leigh of California, Inc. and its co-Defendants[1] (collectively "Jerry Leigh"or "Defendants") of

---

[1]Defendant Suncoast Merchandise Corporation d/b/a Sun Coast provides sales and marketing services to Jerry Leigh. The remaining co-defendants—Kohl's Department Stores, Inc., J Penney Corporation, Inc., Rusty licensing, Inc., and Hot Topic Merchandising, Inc.—sell products manufactured by Jerry Leigh, including the accused products.

manufacturing, distributing, and selling Jerry Leigh's line of HoodieBuddie™ products containing HB3 Technology™ ("the Accused Products") in violation of the '192 Patent.

According to the Defendants, LL&L is not entitled to a preliminary injunction because the '192 Patent is invalid (i.e., the patented technology was anticipated or obvious in light of prior art) and, even if the '192 Patent is valid, the Accused Products do not directly or indirectly infringe. Defendants further contend that LL&L will not be irreparably harmed absent an injunction.

Based on the pleadings, accompanying papers, and argument and evidence presented during the September 17, 2010 hearing, the court finds that LL&L has not met its burden to establish likelihood of success on the merits. Furthermore, even if LL&L had met its burden on the merits prong of the preliminary injunction test, LL&L is not entitled to a preliminary injunction because LL&L fails to present more than speculative evidence of irreparable harm. Accordingly, the Plaintiffs' Motion for Preliminary Injunction is DENIED.

## FACTUAL BACKGROUND

**The Patent and Accused Products**

On September 13, 2005, LL&L filed an application for a patent for "wired clothing and earphones." On April 14, 2009, the United States Patent and Trademark Office granted LL&L's application and issued U.S. Patent No. 7,519,192 (the "'192 Patent"). Lowdown was created in 2009 to design, develop and distribute products, including products under the License. In July 2010, Defendant Lowdown Distribution Inc. received a license from LL&L to practice the '192 Patent. Two other entities related to Lowdown are also licensees of the '192 Patent [collectively the "Licensees"].

The License grants LL&L the right to license the '192 patent to additional parties, but only with the express written content of the Licensees. The Licensees have not granted permission to license the '192 to any other person or entity.

The '192 Patent Claim 1 (the only claim at issue in LL&L's motion for preliminary injunction) focuses on a hooded garment (sometimes referred to as a "hoodie") where the conventional hoodie drawstring is replaced by an earphone wire assembly that itself acts as the drawstring for the hood. Because hoodies and earphones were well known before the patent was issued, the use of the earphone wire assembly as the drawstring was critical to allowance of Claim 1.

Here, the parties dispute the meaning and scope of the language in Claim 1, which provides, in relevant part, that the invention is a "combined garment and earphones" in which the earphones are comprised of

> a <u>conductive wire assembly</u> passing through the elongate internal passageway and having left and right lengths of wire exiting through the left and right apertures, respectively, wherein at least a portion of the conductive wire assembly is slideable within the passageway, and <u>acts as a drawstring for the hood</u>[.]

(U.S. Patent No. 7,519,192 col. 8 *ll*. 29-34 (filed Sept. 13, 2005) (emphasis added).)

LL&L accuses the Defendants of infringing Claim 1 through the marketing and sale of Jerry Leigh's HoodieBuddie™ products containing the trademarked HB3 Technology (the "Accused Products") contained within the passageway at the border of the hood.[2] Defendants describe the HB3 Technology as a "machine-washable lanyard featuring integrated ear buds and

---

[2]The Plaintiffs' claims for contributory infringement and induced infringement are not the subject of the motion for preliminary injunction.

wiring to connect to an audio device, such as an iPhone or other mp3 player[.]" (Decl. of Andrew Leigh (Docket No. 21) ¶ 5.)

During the evidentiary hearing, the court heard from Plaintiffs' expert witness, Dr. Christopher J. Myers (a Professor of Electrical and Computer Engineering and Adjunct Professor of Computer Science and Bioengineering at the University of Utah),[3] and Defendants' expert witness, Andrew Leigh (Owner and President of Jerry Leigh), about whether the wire woven into the Hoodie Buddie lanyard acts as a drawstring when the nylon lanyard is pulled to close the hood.

Mr. Leigh testified that the HB3 Technology is similar to a conventional drawstring but is in the form of a nylon "lanyard" that contains and protects the earphone wire. Opposite ends of the lanyard (and the earphone wire) emerge from left and right apertures at the bottom of the hood, and earphones (ear buds) are fixed to the ends of the nylon lanyard. The washable nylon lanyard acts as the drawstring to tighten or close the hood's opening. The HoodieBuddie earphone wire is significantly longer than the nylon lanyard in which it is contained (the wire is fixed in the lanyard in a serpentine fashion), so that when the lanyard is pulled, the wire is,

---

[3]In the pleadings, the Defendants objected to the declaration of Dr. Myers, which Plaintiffs submitted along with their Reply in Support of Plaintiffs' Motion for Preliminary Injunction. (See Decl. of Dr. Christopher J. Myers (Docket No. 46); Defs.' Objections to Decl. of Dr. Christopher J. Myers (Docket No. 50).) The Defendants objected to the declaration as "untimely," contending that the declaration was "improper and unfairly prejudicial to the Defendants because Plaintiffs have introduced new facts and different legal arguments in the reply brief than were presented in the moving papers." (Defs.' Objection at 1.) The court overrules the Defendants' objection for two reasons. First, the Defendants were able to cross-examine Dr. Myers during the evidentiary hearing. Second, the court finds, as was stated during the hearing, that Dr. Myers is qualified to offer the testimony upon which the court relies (which testimony does not include opinions on the legal issues of claim construction and infringement).

according to the Defendants, physically prevented from acting as a drawstring because it is not pulled taught. "As a result of this construction, the lanyard, not the wire, bears the load when the lanyard is pulled. As such, the wire within the HB3 Technology™ lanyard physically cannot act as a drawstring because the wire cannot be pulled to tighten or close the opening of the hood." (Leigh Decl. ¶ 11.) It follows, according to the Defendants, that because the lanyard of the Accused Products, by design, acts as a drawstring for the hood rather than the earphone wire, there can be no infringement as a matter of law.

In opposition, Dr. Myers testified that "when the [HB3 Technology] lanyard is pulled, . . . the force on the lanyard tightens or closes the hood opening thereby acting as a drawstring. Since the wire is integrated within the lanyard, when the lanyard is pulled, <u>the wire [in the HB3 Technology] also experiences that force and participates in tightening or closing the hood opening</u>." (Decl. of Dr. Christopher J. Myers (Docket No. 46) ¶ 9 (emphasis added).)[4]

**The Activities of Lowdown and Jerry Leigh**

Lowdown is the only entity that is working to market, distribute, import, and sell products covered by the '192 patent in the United States. Although Lowdown has not yet placed its products covered by the '192 patent on the market, Lowdown has begun to advertise and promote those products in preparation for their release on the market, which is currently scheduled to occur on October 1, 2010. Lowdown has pending orders for its products covered by the '192 patent, but it does not specify the size of the orders or from whom they have received orders.

---

[4]Although Dr. Myers elaborated on his opinion during the evidentiary hearing, the above-quoted passage from his declaration is the essence of LL&L's overall response to the Defendants' infringement defense.

According to Lowdown's CEO Edward Zhou, at the beginning of July 2010, Lowdown learned that the Defendants were marketing and selling the Accused Products. He states, in his First Declaration, that:

> One of the most significant competitive advantages in the clothing and apparel industry is to be the first and only supplier of a new product. The prestige of being the first to introduce a new product for the first time carries a mystique for both retailers and consumers that enhances the ability to sell the product. One of the most significant competitive advantages in the clothing and apparel industry is to be the first and only supplier of a new product. A product may be a huge success or an abysmal failure depending on how the product is marketed and to whom it is marketed upon its release. Once a product has been introduced to a particular distributor or retailer, a second-comer marketing a comparable product is at a significant disadvantage because the product has lost its mystique in the eyes of distributors and retailers that have already been previously pitched on the product. Thus, it is much more difficult for second-comers in this industry to secure distribution and retail space for its products as compared to the entity that first introduces a product. Further, marketing a product to a low-price or discount retailer may affect the image of the product such that high-end retailers will no longer carry the product.

(First Decl. of Edward Zhou ¶ 7.) He further asserts that "[o]nce Jerry Leigh and other Defendants establish relationships to distribute and sell products infringing the '192 patent, it will difficult and expensive, if not impossible, for Plaintiffs to establish relationships with those entities for the distribution of its patented products. The loss of these ongoing relationships is an irreparable loss, not compensable by money damages." (Id. ¶ 8.) Then he claims that

> [t]he clothing and apparel industry is incredibly price sensitive. Once a price for a product in this industry has been established in the minds of distributors, retailers, and/or consumers, it is virtually impossible to later sell that product at an increased price. Products in this industry typically garner the highest prices when they are first introduced, and then the price decreases over time. Thus, the first entity to introduce a product typically secures a higher profit per product than subsequent competitors selling comparable products. Additionally, because these types of products are so price sensitive, a company paying even a modest royalty on a product is at a significant competitive disadvantage compared to other parties that are not paying a royalty. For the products covered by the '192 patent at issue

6

> in this Action, the royalty paid per product by Lowdown can be the difference in securing or losing a contract, and if a contract is secured, can represent a significant percentage of the net profit on that product for Lowdown. Thus, even in cases where Lowdown is able to secure contracts to distribute and sell its products covered by the '192 patent, it will have significantly less resources to put back into additional advertisements, marketing and sales activity to generate additional sales of its patented products as compared to those who are not paying a royalty.

(Id. ¶ 9.)

Apparently, Lowdown has already garnered significant customers, such as Nordstrom and Forever21. But the Plaintiffs do not provide evidence that the customers such as Nordstrom have placed orders for products manufactured under the License.

Lowdown is a direct competitor of Jerry Leigh. Mr. Zhou testifies that he did not learn that Jerry Leigh, Kohl's Corp., J Penny Co., Hot Topic Merchandising, Inc., and Sun Coast Merchandising Corp. were marketing and selling the Accused Products until a July 2010 trade show. At least two companies, Sun Diego and Forever 21, have purchased the Accused Products. According to Mr. Zhou, Lowdown has "the present capacity to manufacture and supply products covered by the '192 patent in quantities sufficient to meet the demand of Kohl's Corp., J Penny Co., Rusty North America, LLC, Hot Topic Merchandising, Inc., and Sun Coast Merchandising Corp." (Second Decl. of Edward Zhou ¶ 8.)

Jerry Leigh introduced the first products in the Hoodie Buddie™ line in the fall of 2009 and since that time has invested in an extensive marketing and public relations campaign, including on the Internet, on television, and in print. (Decl. of Andrew Leigh (Docket No. 21) ¶¶ 7-8; Sealed Decl. of Jeff Silver (Docket No. 22) ¶¶ 6-8.)

7

**ANALYSIS**

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. NRDC, Inc., 129 S. Ct. 365, 376 (2008). The Federal Circuit likewise has held that a preliminary injunction for patent infringement is "drastic and extraordinary remedy that is not to be routinely granted." National Steel Car, Ltd. v. Canadian Pacific Railway, Ltd., 357 F.3d 1319, 1324 (Fed. Cir. 2004).

In ruling on a motion for a preliminary injunction for patent infringement, a court must consider four factors: (1) the moving party's reasonable likelihood of success on the merits; (2) whether the moving party will suffer irreparable harm if a preliminary injunction is not granted; (3) whether the balance of hardships tips in favor of the moving party; and (4) whether the public interest favors the grant of a preliminary injunction. Anton/Bauer, Inc. v. PAG, Ltd., 329 F.3d 1343, 1348 (Fed. Cir. 2003). The court must consider all four factors before granting a preliminary injunction, but the court may deny a preliminary injunction if the moving party fails to make a showing on any one of the four factors. Jack Guttman, Inc. v. Kopykake Enters., Inc., 302 F.3d 1352, 1356 (Fed. Cir. 2002).

Here, the Plaintiffs have offered only unsupported factual conclusions regarding possible irreparable harm they may suffer absent a preliminary injunction, which is insufficient as a matter of law. Plaintiffs also have failed to show a likelihood of success on the merits. Each of these failures of proof is fatal to Plaintiffs' request for preliminary injunctive relief. For the reasons set forth below, the court finds that preliminary injunctive relief is not appropriate in this case.

**1.     Likelihood of Success on the Merits**

Jerry Leigh contends that the '192 Patent is invalid. Alternatively, Jerry Leigh contends

that even if the patent is valid, the Accused Products do not infringe because the HB3 Technology in the HoodieBuddie does not meet the drawstring limitation of Claim 1.

To establish a likelihood of success on the merits, Plaintiffs must show two things. First, they must show that the '192 Patent will likely withstand the Defendants' challenge to validity. Second, they must show that they will likely prove infringement. <u>Titan Tire Corp. v. Case New Holland</u>, 566 F.3d 1372, 1376 (Fed. Cir. 2009). But to analyze these issues, the court must first engage in a construction of language in Claim 1.

    a.    <u>Claim Construction</u>

At the preliminary injunction stage, the court need not issue a final claim construction but can instead "engage in a rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves." <u>Jack Guttman, Inc. v.Kopykake Enters., Inc.</u>, 302 F.3d 1352, 1361 (Fed. Cir. 2002).

To construe Claim 1 of the '192 Patent, the court begins with the language of the claim. <u>Rexnord Corp. v. Laitram Corp.</u>, 274 F.3d 1336, 1341 (Fed. Cir. 2001). In the absence of an express intent to impart a novel meaning to a claim term, a "heavy presumption" exists that the term carries its ordinary meaning to one of ordinary skill in the art. <u>Altiris, Inc. v. Symantec Corp.</u>, 318 F.3d 1363, 1369 (Fed. Cir. 2003); <u>CCS Fitness</u>, 288 F.3d at 1366. For example, Claim 1 of the '192 Patent means "what one of ordinary skill in the art at the time of the invention would have understood [it] to mean." <u>Markman</u>, 52 F.3d at 986.

Claim 1 states, in relevant part, that the invention is a "combined garment and earphones" in which the earphones are comprised of

    a <u>conductive wire assembly</u> passing through the elongate internal passageway and

> having left and right lengths of wire exiting through the left and right apertures, respectively, wherein at least a portion of the conductive wire assembly is slideable within the passageway, and <u>acts as a drawstring for the hood</u>[.]

('192 Patent col. 8 *ll*. 29-34 (filed Sept. 13, 2005) (emphasis added).)

The Plaintiffs contend that the meaning of Claim 1's language is unambiguous so the court need not ascribe any particular meaning to the claim terms. They assert that the court need only compare the claim language "conductive wire assembly" and "acts as a drawstring" as commonly understood and explained in the specification to the Accused Products.

Defendants, on the other hand, interpret the scope of Claim 1 by attempting to impose a limitation that the "conductive wire assembly" is an earphone wire. They also construe the language "acts as a drawstring" as follows: "The wire must be used to tighten or close the hood opening. Moveable wiring within the drawstring passageway is not wiring that acts as a drawstring."

The court disagrees with both parties' constructions of Claim 1. As the Plaintiffs point out, the Defendants' construction would be unworkable (i.e., if the claim were construed as Defendants proffer, it would be impossible to infringe Claim 1). (<u>See</u> Pls.' Reply Mem. at 11.) But relying on the plain language, as Plaintiffs do, is unworkable as well.

Instead, the court provides a preliminary claim construction that is guided in part by two sources: (1) the patent applicants' remarks to the patent examiner in a June 10, 2008 reply to the U.S. Patent & Trademark Office ("USPTO") February 21, 2008 rejection of certain claims in the application ("Amendment A"); and (2) the patent examiner's subsequent Notice of Allowability.

In Amendment A, the applicants asked the USPTO to allow an amendment to the patent application of Logan Haycock et al. The applicants remarked in relevant part as follows:

In the Office Action, claims 1-7 were rejected under 35 U.S.C. § 103(a) as being unpatentable over Eves, U.S. Publication No. 2001/0050991 ("*Eves*"), in view of Cyr et al., U.S. Publication No. 2006/0182297 ("*Cyr*"). Applicants respectfully request removal of the rejection under 35 U.S.C. § 103(a) of claims 1-7 because *Eves* in view of *Cyr* does not teach or suggest wiring that "acts as a drawstring" as claims in applicants' claim 1.

**_Eves_ teaches wiring that is moveable within the internal passageways in the clothing. Moveable wiring within a passageway is not wiring that acts as a drawstring.** The moveable wiring disclosed in *Eves* serves to minimize the amount of loose cable. In one embodiment shown in figures 7 and 8 in *Eves* this wiring emerges "discretely from the collar close to the user's ears such that there is a minimum of loose cable." *Eves* does not teach or suggest that this wiring be used to tighten or close an opening in the clothing. The disclosure does not show or explain that the wiring goes around the periphery of the collar so that the wiring could possibly be used as a drawstring. The configuration only allows the ear pieces to emerge discretely from the collar and minimizes the amount of loose wire.

Referring specifically to figures 7 and 8 in *Eves*, one can observe that the disclosed configuration would not function as a drawstring. If a user were to pull on the wiring in the direction away from the ear piece attempting to tighten the collar, the ear piece would move in the same direction and not provide resistance allowing the collar to be drawn.

("Remarks" in Amendment A to Patent Application at pp. 7-8 (Docket No. 16-1 at pp. 98-99)

(emphases added).)

In response to Amendment A, the USPTO issued a Notice of Allowability, with the following explanation:

Claims 1-10 and 13 are allowed. The following is a statement of reasons for the indication of allowable subject matter: As set forth in the previous action, claim 1 discloses the unique feature of having a conductive wire slideable through the passageway, and acting as a drawstring for a hooded garment. The closest prior art fails to teach a slidable conductive wire that acts as a drawstring for a hood.

(USPTO Notice of Allowability, Application/Control Number 11/224,888, Art Unit 2614, at p. 2

(Docket No. 16-1 at p. 123).)

11

Given the above-quoted language, the court makes the following preliminary construction of Claim 1 in the '192 Patent:

> **"The wire must be used to tighten or close the hood opening. Moveable wiring within the drawstring passageway is not necessarily wiring that acts as a drawstring."**

Under the court's construction, the issues of validity and infringement can now be addressed.

    b.    <u>Validity</u>

The claims of the '192 Patent are presumed valid. <u>See</u> 35 U.S.C. § 282 (2009); <u>Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc.</u>, 134 F.3d 1085, 1088 (Fed. Cir. 1998). "[A] patent enjoys the same presumption of validity during preliminary injunction proceedings as at other stages of litigation." <u>Titan Tire</u>, 566 F.3d at 1377 (citing <u>Canon Computer Sys.</u>, 134 F.3d at 1088); <u>see also</u> 35 U.S.C. § 282. To overcome this presumption, the Defendants must demonstrate "substantial questions of invalidity" by clear and convincing evidence. <u>Amazon.com, Inc. v. Barnesandnoble.com, Inc.</u>, 239 F.3d 1343, 1358 (Fed. Cir. 2001). That is, Plaintiffs bear the burden to show that these invalidity defenses "lack substantial merit." <u>Anton/Bauer</u>, 329 F.3d at 1348.

Jerry Leigh contends that the '192 Patent "is invalid due to anticipation under 35 U.S.C. § 102 and/or obviousness under 35 U.S.C. § 103 because the subject matter claimed in the '192 patent, including the Earphone Wire Drawstring feature, was expressly or inherently disclosed and/or strongly suggested in numerous prior art patents, products, and printed publications." (Defs.' Mem. Opp'n at 13.) For the reasons set forth below, the court finds that the Defendants have not met their burden of showing invalidity in the preliminary injunction context.

A patent claim is invalid due to anticipation under 35 U.S.C. § 102, "if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference." Verdegaal Bros. v. Union Oil Co. of Cal., 814 F.2d 628, 631 (Fed. Cir. 1987).

A patent is invalid due to obviousness under 35 U.S.C. § 103 if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 406 (U.S. 2007). As the Supreme Court explained, a "patent for a combination which only unites old elements with no change in their respective functions . . . obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men." KSR, 550 U.S. at 415-16.

Defendants have a heavy burden to meet. The court has reviewed the prior art listed in the '192 Patent. Those references do not suggest, at this stage, that the patent was obvious or anticipated. Defendants provide a separate list of other prior art in the form of articles and images found on the Internet, and other patents or patent applications not referenced by the examiner of the '192 Patent. Given the crowded field, the court finds that the nature of the evidence provided by the Defendants is simply not sufficient to meet their heavy burden.

    c.    <u>Infringement</u>

To establish infringement, Plaintiffs must first show that the Accused Products include "each claim limitation [of at least one claim of the '192 Patent] either literally or under the doctrine of equivalents." Seachange Int'l Inc. v. C-COR Inc., 413 F.3d 1361, 1377 (Fed. Cir.

2005) (citing Catalina Mkt'g Int'l v. Coolsavings.com, Inc., 289 F.3d 801, 812 (Fed. Cir. 2002)). The court analyzes the Plaintiffs' showing "in light of the presumptions and burdens that will inhere at trial on the merits." Purdue Pharma L.P. v. Boehringer Ingelheim GMBH, 237 F.3d 1359, 1363 (Fed. Cir. 2001) (internal citations omitted). At trial, Plaintiffs will be required to show infringement by a preponderance of the evidence. Kegel Co., Inc. v. AMF Bowling, Inc., 127 F.3d 1420, 1425 (Fed. Cir. 1997).

In evaluating Plaintiffs' likelihood of success on its infringement claim, the court conducts the same two-step infringement analysis that it would conduct at a later stage of litigation. See Oakley, Inc. v. Sunglass Hut Int'l, 316 F.3d 1331,1339 (Fed. Cir. 2003). First, as has already been done, the court construes or determines the scope and meaning of the claim at issue. Id.; Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996) (holding claim construction a question of law). Second, the court compares the construed claim to the accused product to determine whether the product meets each of the claim limitations. Oakley, 316 F.3d at 1339; see also CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1365 (Fed. Cir. 2002).

In light of the court's preliminary claim construction, and based on the evidence now before the court, a comparison of the Accused Products to the construed claim leads the court to find the question of infringement to be a close one.[5] The court cannot comfortably conclude that

---

[5] "To prove infringement, the patentee must show that the accused device meets each claim limitation, either literally or under the doctrine of equivalents." Playtex Prods., Inc. v. Procter & Gamble Co., 400 F.3d 901, 906 (Fed. Cir. 2005). Because the doctrine of equivalents was not sufficiently explored by the parties in their briefs and at the hearing, the court does not reach that issue.

the nylon lanyard is "acting as" a drawstring. But neither can the court conclude that the wire within the lanyard (which does travel to some extent with the lanyard as the hood is closed on the HoodieBuddie) does not contribute to closure of the hood.[6] Given the ambiguities in the record, the court finds that Plaintiffs have not established a likelihood of success on the merits and so are not entitled to injunctive relief at this time.

## 2. **Irreparable Harm**

Alternatively, the court holds that even if the Accused Products infringe the '192 Patent, the Plaintiffs have not met their burden of establishing irreparable harm.

First, the court notes that the United States Supreme Court, in its decision in eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 392-94 (2006), discarded the former presumption of irreparable harm that was based solely on proof of infringement of a valid patent. See also Automated Merch. Sys. v. Crane Co., 357 Fed. Appx. 297, 301 (Fed. Cir. 2009). So Plaintiffs may not rely on that to support their claim of irreparable harm.

Second, and the reason why this court finds that Plaintiffs have not established irreparable harm, "[t]he essence of showing irreparable harm is demonstrating an injury that money damages cannot sufficiently remedy." Voile Mfg. Corp. v. Dandurand, 551 F. Supp. 2d 1301, 1307 (D. Utah 2008) (citing High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc., 49 F.3d 1551, 1557 (Fed. Cir. 1995)). And establishing irreparable harm requires more than speculation and conclusory statements. The mere possibility of irreparable harm is insufficient to justify a

---

[6]See Litton Sys., Inc. v. Sundstrand Corp., 750 F.2d 952, 955-56 (Fed. Cir. 1984) (affirming district court finding that because merits of trademark case was a "toss up," movant failed to established likelihood of success in preliminary injunction analysis).

preliminary injunction: "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. HRDC, Inc., 129 S. Ct. 365, 375-76 (2008). Consistent with the Supreme Court's cautions against granting injunctions on the basis of possible harm, this court stated in Voile that, "[c]ourts require more than unsupported factual conclusions to support such a finding." Id. Here, the Plaintiffs provide no more than speculative and conclusory statements about the irreparable harm. That is not sufficient. Id.

Based on the record, the court finds that money damages would sufficiently remedy any harm the Plaintiffs have convincingly established. All their other claims of harm are simply too conclusory, speculative, or remote to justify a finding of irreparable harm.

**3.     Balance of Harms**

The Plaintiffs mainly rely on the alleged irreparable harm to support the conclusion that the balance of harms favors them. (See Pls.' Mem. Supp. Mot. Prelim. Inj. at 16 ("In this case, the equities clearly favor the issuance of a preliminary injunction. Plaintiffs have described how Defendants' exploitation of Plaintiffs' patented technology has and will continue to result in irremediable loss of some or all of the market opportunities arising from Plaintiffs' position in the market.").) They summarily conclude that

> any loss to the retailer Defendants can be avoided by those Defendants selling the patented products offered by Plaintiffs. In short, any profits that may be lost by Defendants should an injunction issue will be lost by Plaintiffs should an injunction not issue.

(Pls.' Reply Mem. (Docket No. 44) at 23.)

The Defendants also assert that they will be harmed if an injunction is granted. Jeff Silver, the Chief Financial Officer of Jerry Leigh, testified in his Sealed Declaration that if an injunction is granted requiring cessation of all sales and manufacturing of all HB3 Technology™ products, products would have to be taken off the shelves at the thousands of retail stores that currently carry the HB3 Technology™ products. (Silver Decl. ¶ 18.) An injunction would cause significant disruption to the businesses of Defendants Kohl's, JC Penney, and Hot Topic, who would be required to expend substantial resources and employee time to remove the products from store shelves and return them to Defendant Jerry Leigh. (Id. ¶¶ 19-24.)

And an injunction could cause the loss of employment of a substantial number of employees at Jerry Leigh. (Id. ¶ 18.)

In addition, Jerry Leigh may be liable for the full wholesale price paid by the retailers, and may also be liable for the difference between the retailers' sales plans and actual sales before the injunction. (Id.)

Granting the Plaintiffs' request for an injunction would have immediate and significant repercussions for the Defendants. In these circumstances, when they are compared to the Plaintiffs' claimed harms, the balance of hardships tips decidedly in favor of Defendants and against granting preliminary injunctive relief.

**4.    Public Interest**

In general, the public interest inquiry follows the likelihood of success of the merits; that is, the public interest is best served by enforcing patents only if they are likely valid and infringed. Abbott Labs., 452 F.3d at 1348. As Plaintiffs did not establish a likelihood of success on the merits, as explained above, the public interest factor weighs in favor of denying the

preliminary injunction.

**ORDER**

For the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction (Docket No. 4) is DENIED.

DATED this 8th day of October, 2010.

BY THE COURT:

TENA CAMPBELL
Chief Judge